CRAIG, APPELLEE, *v.* CITY OF TOLEDO, APPELLANT.

(Decided December 12, 1938.)

*Messrs. Reams, Bretherton & Neipp,* for appellee.
*Mr. Martin S. Dodd,* director of law, and *Mr. Joe H. Nathanson,* for appellant.

OVERMYER, J. In Common Pleas Court the plaintiff, Verdie Craig, recovered a verdict and judgment against the defendant, the city of Toledo, Ohio, in the sum of $8,750. Injuries were sustained by her on December 27, 1936, at about ten o'clock p. m., a dark, rainy night, when an automobile, in which she was riding with her husband on Wildwood boulevard, collided with a stone wall or abutment, being a part of an uncompleted bridge erected across said boulevard. She brought this action for damages.

Some fifteen assignments of error, further subdivided into various particular complaints, are urged as grounds for reversal of the judgment. Our attention is particularly directed to the following assigned errors: That the court failed to direct a verdict for the city; that it failed to enter judgment notwithstanding the verdict; that it failed to grant a new trial; that it erred in the reception and exclusion of evidence; that it erred in refusing certain special charges; that it erred in the charge as given; and that the verdict is not sustained by the evidence, is against the weight of it, contrary to law, and excessive, due to passion and prejudice.

From the record we learn that Wildwood boulevard is a somewhat winding thoroughfare running from River road to Detroit avenue in said city, and that some 600 feet west of River road it is intersected by a gully about 17 feet deep and some 50 feet wide at the top; that on each side of the gully the city, about 1930, had caused to be erected stone walls at right angles to the boulevard roadway; that these stone walls were erected as abutments for a bridge to be built with a

floor to cross the gully, but no floor had ever been built; that the boulevard sloped gradually toward the gully to within some 15 feet of the wall, then sloped abruptly to the wall; that the wall was some 3 feet above the level of the roadway at that point; that some 15 years previous to the event here involved, the city had built and maintained at that point a wooden bridge across the gully which was used by vehicular traffic and foot travelers; that the same became unsafe, was taken down by the city and the stone walls erected by the city with a view to a permanent structure; that, the bridge not being then completed, the city placed four posts across the roadway about ten feet from each wall, on which posts, at right angles, were nailed boards or planks to form a barricade against traffic over the stone walls and open gully between the walls; and that no lights were maintained at the walls at the time in question, but a street light across the gully and ahead of a motorist coming from the east was suspended on a pole and burning about 185 feet west of the gully and walls, on the west side of the roadway. The evidence also tends to show that this light did not light up the walls or posts, at least on the side from which plaintiff approached, but tended to invite a stranger into the belief that the way was open. No other light is shown to have been located in the vicinity of the stone abutments. The cross-boards or planks on the four posts on the east side of the gully and wall, from which direction the plaintiff approached, had been removed and carried away by some one, leaving only the posts which were some 36 to 48 inches high and of a dark grayish color at night. According to a profile plat of the elevations of the roadway and abutments, it is apparent that these posts could not, because of the abrupt slope of the roadway, be seen at all, especially at night, until one was within a short distance of them.

On the night in question the plaintiff, about 33 years

of age, the mother of five children and then with child, was riding with her husband in that section of the city "to get some fresh air." They entered Wildwood boulevard from the River road with the intention of driving through to Detroit avenue. Neither plaintiff nor her husband had ever traveled on this boulevard but had seen the street signs indicating the boulevard at both the River road and Detroit avenue ends. They approached the walls and gully with bright lights on the car. They state they did not know of the existence of the walls and gully, and it appears that the only warning sign was an ordinary metal reflector road sign about 2 feet in diameter bearing a cross painted thereon, located 186 feet east of the east wall and set about 25 feet west of the traveled part of the roadway near the point where the roadway begins a decided curve to the right from a straight line toward the gully and walls. There is evidence showing that the post of this sign had become twisted, turning the face of the sign somewhat, so that the usefulness of it as a reflector was impaired. Both the plaintiff and her husband testify that they did not see this warning sign; did not know of any danger confronting them; saw the street light some distance ahead and assumed and believed the road to be open. They were driving from 15 to 20 miles per hour. Describing the collision, the husband, driver of the car, testified as follows:

"I proceeded down that street [Wildwood boulevard] and all at once an object appeared in front of my left headlight which I at that time took to be a man. I immediately swerved the car a little bit to miss it and then I knew no more.

"Q. You mean you became unconscious? A. Yes, sir."

He then states that after recovering consciousness, several days later, he learned the object he thought was a person was one of the posts hereinbefore referred to east of the stone wall, and then learned that

he had missed the post, driven between two posts and hit the stone wall. He also states that he later learned from a visit he made to the spot that the posts may have been once whitewashed, but in wet weather the posts are "very, very gray." Plaintiff was also rendered unconscious and remembers nothing of seeing any obstruction or striking anything.

The charges of negligence, set forth in the petition against the city, are that sufficient barricades and warning signs were not provided by the city; that it failed to light the walls and gully; that it failed to provide a bridge across the gully; and that it maintained the walls, gully and roadway in a dangerous, unlighted, ungraded and unprotected condition.

We are clearly of the opinion that the condition there existing at the time referred to, as shown by the testimony of a number of witnesses and by certain photographs in evidence, constituted a nuisance and a menace, in fact a veritable trap into which a stranger to the thoroughfare could easily be lured, especially in the night time. The city concedes that whatever condition existed there at the time, had so existed for a sufficient length of time to bring notice of its condition to whosoever was responsible, but denies the responsibility of the city upon the grounds that Wildwood boulevard and the area of which it is a part had never been formally accepted by resolution of council, and that a reverter contained in the deeds by which the city had originally secured title, had become effective and title had some years before reverted to the former owners, at least the title to the particular place where the accident occurred.

The considerable area of land in which Wildwood boulevard is located and which, prior to 1923, was outside but contiguous to the city, was acquired in three separate parcels by the city. Most of it was acquired by deed from The Wiltsie Realty Company, an Ohio corporation, in January, 1915; another part by deed

from the same company in December, 1915; and another part by condemnation proceedings in June, 1915. The deeds conveyed a determinable fee to the city for public park and boulevard purposes. The first deed contained the following provisions:

"To have and to hold * * * for public park and boulevard purposes only * * * said grantee, its successors and assigns * * * hereby covenants and agrees * * * to grade, build and construct and maintain in good and proper condition, the boulevards and roadways * * * and will surface said boulevards and roadways with six inches of cinders, and construct and maintain the necessary culverts and drains * * * and construct before April 30, 1916, a bridge over and across the Miami and Erie Canal [note, not the bridge involved in this action] * * * that should the premises herein conveyed cease to be used for public park and boulevard purposes, or should any part thereof be used for any other purpose, or should grantee, its successors and assigns, fail or neglect to fulfill or carry out each and every of the covenants and agreements on its part * * * or violate or permit to be violated any of the covenants and provisions hereof, said premises and easements herein conveyed, and all the right, title and interest therein of the grantee, its successors and assigns, shall thereupon revert to said grantor, its successors and assigns."

The first deed also contained a provision that the city was forthwith to acquire certain other property in that area, some of which belonged to the grantor, The Wiltsie Realty Company, and some to other owners. These properties were acquired by the second deed above mentioned and by the condemnation proceedings referred to.

The second deed from The Wiltsie Realty Company contained in substance the same general provisions as to streets, boulevards, grading, cindering, etc., and the

same determinable fee was conveyed, containing this further covenant as to the city:

"Will forthwith grade, build and maintain in substantial and proper manner, and thereafter maintain in good condition the boulevards and roadways between the River road and Detroit avenue in accordance with the plans adopted by the board of park commissioners of said city of Toledo, and will surface said boulevards and roadways with six inches of cinders and construct and maintain the necessary culverts and road drains" etc.

We think the estate granted to the city by these deeds was an estate in fee simple determinable, and that The Wiltsie Realty Company has a possibility of reverter. 1 Restatement of the Law of Property, 57, 128 and 129, Sections 23 and 44, illustrations 4 and 17.

Whether the corporation, grantor in the deeds, is still in existence to receive title, or whether there is a successor or assignee of the corporation that has acquired a possibility of reverter from the corporation, does not appear from the record.

The evidence shows that the boulevard here involved had been used by the public as a thoroughfare for many years before that area was acquired by the city, and in the first deed there is a plat of the area showing the boulevard connecting with the streets of the city. The three parcels acquired included all of Wildwood boulevard from River road to Detroit avenue, and certain other streets and highways.

At the time this area was acquired by the city, the transaction was made on behalf of the city by the board of park commissioners of the city, acting under Section 4053 *et seq.*, General Code. Since that time Toledo has become a charter city and the board of park commissioners has ceased to exist. Under the provisions of the statute above cited and the evidence, we think the transactions were regular and authorized and that Wildwood boulevard was regularly acquired in

1915 by the city of Toledo, acting through its board of park commissioners under statutory authority. In any event, it seems to be beyond argument that when the city, in 1923, by appropriate proceedings, annexed the entire Wildwood boulevard area, including the entire length of the boulevard then in existence between River road and Detroit avenue, it definitely became "streets, public grounds, bridges and viaducts" within the city of Toledo, subject to the obligations imposed by Section 3714, General Code, to keep open, in repair and free from nuisance. As to the duties of a municipality in these respects, see 28 Ohio Jurisprudence, 546, 978, Sections 343 and 615.

It appears from the evidence that from 1915 up to the annexation of the premises in 1923 and since that time, the city has exercised dominion over this boulevard by grading, oiling and cindering; by erecting and maintaining a wooden bridge at said gully, then tearing it away when it became unsafe and erecting the stone walls or abutments and placing the posts and cross-bars as a barricade; and by taxing abutting property owners on the boulevard for its upkeep and maintenance. Whether the barricade originally erected was sufficient to meet reasonable requirements, is not a fact we are required to decide, but a finding that in December, 1936, they were not so sufficient will not be disturbed by the court.

The city contends that a verdict should have been directed against the plaintiff because there is no proof of acceptance of the original dedication of Wildwood boulevard by formal ordinance of council, as provided by Section 3723, General Code. This section, however, was enacted before the enactments creating a board of park commissioners and giving that board the broad powers enumerated in Sections 4053 to 4063, General Code. The records of that board, in evidence, show a formal acceptance of the deeds by which nearly all the area was acquired by the city for public park and bou-

levard purposes, and surely that part acquired by the city by condemnation proceedings instituted by the city, could not well now be claimed not to have been duly accepted by the city. Moreover, there are exceptions to the strict provisions of Section 3723, General Code, which requires formal acceptance of a dedicated street by ordinance of council before the provisions of Section 3714, General Code, apply, requiring the city to keep such street in repair, etc. One instance is where territory which already has a road connecting with city streets is annexed to the city. (*City of Steubenville* v. *King,* 23 Ohio St., 610, a case where the facts are quite similar to ours). Another instance is where council approves a plat conveying streets to a city. *Village of Bay* v. *U. S. Fidelity & Guaranty Co.,* 24 Ohio App., 73, 156 N. E., 227. User by the public is not alone sufficient to prove acceptance, but acts of acceptance by proper officials, which we think in this case was the board of park commissioners, acting under statutory authority, must be shown, and here was shown. *Rd. Co.* v. *Roseville,* 76 Ohio St., 108, 81 N. E., 178.

We do not think the question of compliance with Section 3723, General Code, requiring formal acceptance by ordinance of council of the dedication of a street before the obligations imposed by Section 3714, General Code, become operative, has any application in this case. Section 3723, General Code, is clearly intended to prevent owners of private property in the municipality from laying out streets and alleys and, without acceptance on the part of the municipality, make it liable under the provisions of Section 3714, General Code, to keep them open, in repair and free from nuisance. See *Wisby* v. *Bonte,* 19 Ohio St., 238; *B. & O. Rd. Co.* v. *Oak Hill,* 25 Ohio App., 301, 157 N. E., 817; *Hermann* v. *Spitzmiller,* 24 C. C. (N. S.), 20, 34 C. D., 453.

In the case before us it is not disputed that in 1915

the city became the owner of a determinable fee of the entire area of which Wildwood boulevard is a part, subject only to be divested under the reverter provi-, sions of the deeds. No claim of reverter by the grantor is shown ever to have been made in the 23 years since the city acquired the property, and the city has improved and maintained the boulevard through all those years and exercised dominion over it.

We do not think the claim of reverter advanced by the city as a defense to this action has any merit. Not only does the evidence fail to show a reverter, but we think the city is estopped from advancing the claim that by its own negligent acts and breach of the contract represented by the deeds by which it obtained title, it can now say, to escape liability in this case, that it is invoking a reverter in the deeds, running to a former owner who is not seeking to enforce it. Moreover, we are not able to determine from the record and briefs how broad the claims of reverter are sought to be made by the city. As we understand its claims, from the evidence offered by the city and the brief, they are to this effect, viz., that the city had maintained and kept said boulevard in repair except the last 58 feet before reaching the east stone wall here involved, which 58 foot space and the bridge over the gully they had not maintained and kept in repair since 1930, and that by its failure in that respect said 58 feet and the gully and abutments (built by the city) had reverted to the former owners. In all other respects, as we understand it, the city is not surrendering, by reverter, the Wildwood boulevard area nor the boulevard itself, nor any other roadways. In other words, it seeks only to revert the spot where the accident happened, whether the former owner wants it or not. We think these claims are untenable and unconscionable. We cannot believe that because of this lawsuit counsel mean to say that this entire valuable area of territory between River road and Detroit avenue,

with all its boulevards, roadways and public park facilities, is surrendered by the city, and has been surrendered *ex post facto* since 1930. Such abandonment of property would very likely have to be made by proceedings other than collaterally by a defense in a suit against the city for personal injuries.

Some claim is made by the city in connection with its claim of reverter that the immediate place of the accident having reverted to the former owner, the boulevard at that point was a dead-end street. Even in such event, we would say that whatever barrier or barricade was there to warn travelers of a dead-end street, or whatever warning sign had been there erected, was all done by the city, and whether or not such barricades and sign were a sufficient warning would be a jury question. *Bourdeau* v. *City of Toledo,* 55 Ohio App., 478, 9 N. E. (2d), 878.

The many other assignments of error relate to incidents of the trial, and to discuss them in detail would extend this memorandum to unjustifiable lengths and would serve no useful purpose. Most of them are based upon the questions hereinbefore discussed. We have examined them in detail and find none of them of a prejudicial character requiring or justifying a reversal of the judgment.

The injuries received by appellee were serious. She was unconscious for several days after the accident; she bears permanent scars; her one knee cap was cut and chipped and permanently disabled; both bones of the right forearm broken; three ribs broken; she sustained many bruises; and she suffered shock, which resulted in a miscarriage. She spent 20 days in a hospital, and had to be carried on a chair to her home, where she was' confined to bed for nearly a month, and when she was taken to the doctor's office, she had to be carried in a chair. The medical witnesses do not expect full recovery from the injuries. We do not find the verdict against the weight of the evidence, but feel

it is sustained by the evidence. Nothing has been brought to the court's attention to support the claim that the verdict was the result of passion or prejudice.

Finding no prejudicial error in the record and that the verdict and judgment are not against the manifest weight of the evidence, the judgment will be affirmed.

*Judgment affirmed.*

LLOYD, P. J., and CARPENTER, J., concur.